UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SINGAS FAMOUS PIZZA BRANDS CORP.
and SINGAS FAMOUS PIZZA &
RESTAURANT CORP.,

                    Plaintiffs,

          -vs-

NEW YORK ADVERTISING LLC f/k/a
GANESHA OAK, LLC, KAMINI VADHAN, 11
CLASSIC, INC. and SINGAS EXPRESS, INC.,

                    Defendants.

---

10 Civ. 8976 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

Plaintiffs Singas Famous Pizza Brands Corp. and Singas Famous Pizza &
Restaurant Corp. (together "Singas") are owners of a chain of franchised pizza
restaurants and trademarks used in operating those restaurants.  Singas brought this action
alleging trademark infringement and breach of contract by defendants New York
Advertising LLC, f/k/a Ganesha Oak, LLC, Kamini Vadhan, 11 Classic, Inc. and Singas
Express, Inc., who are entities or persons in some way allegedly involved in owning or
operating pizza restaurants at 94 Avenue C in Manhattan (the "Avenue C Restaurant")
and/or 35-68 73rd Street in Queens (the "Jackson Heights Restaurant").  Before the Court
is Singas's motion for a preliminary injunction restraining the defendants from operating
the Avenue C Restaurant and the Jackson Heights Restaurant or, in the alternative, from
operating those restaurants using Singas's trademarks.  For the following reasons, the
motion is GRANTED.

**BACKGROUND**

Since 2004, Singas has owned and operated a franchise of pizza restaurants in New York, New Jersey, and Pennsylvania under the name of Singas Famous Pizza.   (Tr. of Jan. 14, 2011 Hr'g ("Tr.") 3, 5.)  The restaurants primarily sell ten-inch specialty pizzas, but also offer a series of other Italian foods and other food.  (Tr. 19.)  Since 1967, Singas has used the word mark "SINGAS FAMOUS PIZZA," which was registered with the United States Patent and Trademark Office on March 19, 1996.  (Alemela Aff., Nov. 29, 2010, Ex. G.)  Since 2006, Singas has used a logo for which it filed a trademark registration on August 10, 2010.   (*Id.* ¶ 2.)  Gregory Tsanis is the President of Singas and Enrique Almela is the operations manager.  (Tr. 3, 6.)

On March 17, 2005, Singas entered into a franchise agreement (the "Agreement") with defendant Ganesha Oak LLC ("Ganesha Oak").  (Pl.'s Ex. 1 ("Agreement").)  Tsanis signed that agreement on behalf of Singas and defendant Kamini Vadhan ("Kamini") signed on behalf of Ganesha Oak as President of that entity.  (Tr. 6.)  The Agreement contained the following relevant provisions, the first of which is known as the In-Term Covenant and the second of which is known as the Post-Term Covenant:

> **22.02**  The Franchisee, and if applicable, any officers, directors and five percent (5%) or greater shareholders of a corporation which owns the franchisee shall not, during the period of Franchisee's Affiliation with Franchisor . . . engage, either directly or indirectly, in the ownership or operation, as a shareholder, through agents, affiliated or otherwise in any business which is the same or substantially similar to Singas (except for the Singas with which Franchisee's involvement has been authorized by Franchisor) including, without limitation, any Italian food business.

> **22.03**  Upon termination or nonrenewal of this Agreement, the Franchisee shall immediately cease all pizza service related business activities.  The Franchisee, and if applicable, any officers, directors and five percent (5%) or greater shareholders of a corporation which owns the franchise, agrees for a period of two (2) years from the date of termination . . . not to either directly or indirectly

> continue engaging in the Italian food service business, nor acquire any interest in any competitive Italian food service business or venture or any substantially similar business to that of a Singas franchise within ten (10) miles of the Singas where Franchisee had the Affiliation.  Franchisee acknowledges that the terms and conditions of this covenant are fair and reasonable to both the time and distance restrictions.

In addition, the Agreement provided that "Franchisee acknowledges that the restrictions set forth in this Section 22 are reasonable and necessary for the protection of the proprietary interest of the Franchisor [and] the violation of them would cause substantial and irreparable injury to Franchisor . . . ."  (Agreement ¶ 22.05).  As an addendum to the Agreement, the parties also signed a Nondisclosure and Non-Competition Agreement (the "Non-Competition Agreement") that contained provisions materially identical to the In-Term and Post-Term Covenants.  Kamini also signed a separate document in which she agreed to personally guarantee the obligations of a franchisee under the Agreement. (Almela Aff., Nov. 29, 2010, Ex. E.)

The Agreement made Ganesha Oak a franchisee, but Kamini does not remember whether she ever obtained the corporate name of Ganesha Oak LLC.  (K. Vadhan Dep. 26-27.)  On December 26, 2007, the corporate name of Ganesha Oak LLC changed to New York Advertising LLC (Einbinder Aff. Ex. F), also named as a defendant, though Kamini claims to never have heard of New York Advertising LLC or the individual named as agent for service of process for that company.  (*Id.* 25-26.)  In any event, Kamini looked for years for a location to open a franchise.  In 2009, she found a location at 94 Avenue C.  Singas agreed to that location because Singas had a former franchise on Second Avenue that had enjoyed success.  (Tr. 32.)  After Singas approved the location, Kamini signed a lease for the property and attempted to use the name Temple, Inc.  (K. Vadhan Dep. 34.)  When the New York Secretary of State did not approve that name,

Kamini formed defendant 11 Classic, Inc., with herself as President, as owner of the

Avenue C Restaurant.  (Tr. 57.)  However, Kamini admits that she has no agreement with

Singas to operate a franchise owned by 11 Classic, and Almela testified that he had never

heard of that entity before filing this lawsuit.  (Tr. 27, 41.)  Defendants introduced a

certificate for an insurance policy for 11 Classic (Defs.' Ex. A), which Kamini testified

she obtained at Singas's request and sent to Singas.  (Tr. 57-58)  But Almela denied ever

receiving the certificate (Tr. 41) and defendants introduced no evidence to the contrary.

The Avenue C Restaurant opened for business in January 2010.

At some time late in the summer of 2010, Kamini's husband Arun, who had

operated several restaurants in New York over the past two decades, contacted Almela

about opening a Singas franchise at the current location of the Jackson Heights

Restaurant, which is next to a location at which Arun operated an Indian restaurant until

August 30, 2010.  (Tr. 13; A. Vadhan Dep. 9-11.)  In August, the Vadhans met with

Almela in person at the Indian restaurant to discuss the matter.  (Tr. 13.)  While both

sides agree that Tsanis, not Almela, would make the final decision, they disagree about

how Almela reacted to the proposal.   Almela testified that he told the Vadhans that he

believed Tsanis was unlikely to approve a franchise at the location because the space was

too small and was located only a mile from Singas's flagship restaurant.  (Tr. 13-14, 45.)

Arun, however, testified that Almela told him that the location was promising and that

Tsanis was likely to approve it.  (Tr. 69; A. Vadhan Dep. 16.)

It is, however, undisputed that Tsanis ultimately rejected the location after

meeting with Arun on site.  (Tr. 46, 71.)  Almela testified that it was his understanding

that Tsanis rejected the location for the same reasons that Almela had found it unsuitable.

(Tr. 15, 46.)  Arun testified that Tsanis rejected the location because it was too close to Elmhurst Famous Pizza whose owner, Louie, had trained Tsanis and might be pushed to compete with Singas more aggressively if Singas opened a franchise in the area.  (Tr. 71; A. Vadhan Dep. 18-19.)

That left Arun in a difficult position.  Neither of the Vadhans could provide much detail regarding how the Jackson Heights Restaurant was financed (K. Vadhan Dep. 17, A. Vadhan Dep. 10-13) and defendants failed to produce any documentation of the financing despite requests from Singas's counsel to do so.  (Tr. 79.)  But Arun testified that he had invested nearly $100,000 in the Jackson Heights location (Tr. 67-68), and had sold the Indian restaurant he operated next door. (A. Vadhan Dep. 10-11.)  Whether for that reason or another, Arun pressed ahead and formed defendant Singas Express, Inc. as the owner of the restaurant at the Jackson Heights location.  (Tr. 17-18.)  He also purchased advertising in an Indian newspaper in Queens listing both the Jackson Heights Restaurant and the Avenue C Restaurant on the same page.   (K. Vadhan Dep. 64-65; A. Vadhan Dep. 37.)  The Jackson Heights Restaurant opened under the name of Famous Pizza on November 4, 2010. (Tr. 72.)

Almela became aware that the Jackson Heights Restaurant was about to open on November 1, 2010.  (Almela Aff., Nov. 29, 2010, ¶ 10.)   On November 3, 2010, Singas, through counsel, sent a letter to Ganesha Oak stating that operating the Jackson Heights Restaurant was a breach of the In-Term Covenant and demanding that Ganesha Oak and any of its officers or owners cease and desist from operating the Jackson Heights Restaurant.  (Alemela Aff., Nov. 29, 2010, Ex. H.)  The letter also stated that failure to cease and desist within fifteen days would lead to termination of the Agreement.  (*Id.*)

After the November 3, 2010 letter was returned undelivered, Singas learned that Ganesha Oak had changed its name to New York Advertising and forwarded a copy of the letter to the address listed with the New York Secretary of State for service of process on Ganesha Oak as well as to the Avenue C Restaurant on November 9, 2010.  (*Id.*)  Records show that Vadhan received that letter but never responded to it.  (Pl.'s Ex. 5.)  On November 12, 2010, Singas, again through counsel, renewed its demand that Ganesha Oak and its owners and officers cease and desist operating the Jackson Heights Restaurant and using materials that infringed on Singas marks at that restaurant.  (Alemela Aff., Nov. 29, 2010, Ex. M.)  Singas received no response.

On November 18, 2010, Almela visited the Jackson Heights Restaurant.  Almela observed several aspects of the restaurant that suggested a connection to the Avenue C Restaurant.  Almela recognized an employee at the Jackson Heights Restaurant as a former employee of the Avenue C Restaurant named José.  (Tr. 16.)  Almela testified that José told him—and Arun admitted—that the owners of the Jackson Heights Restaurant brought him over from the Avenue C Restaurant to make the pizza.  (Tr. 17; A. Vadhan Dep. 30.)  Almela asked José to call the owner of the Jackson Heights Restaurant and José put him on the line with Kamini. (Tr. 16.)

During his visit to the Jackson Heights Restaurant, Almela observed that the Jackson Heights Restaurant was using small machetes to cut pizza, a practice that Almela testified was to his knowledge unique to Singas.  (Tr. 19-20.)  Almela also observed that the Jackson Heights Restaurant appeared to be using pizza pans from the Avenue C Restaurant that had been custom made for Singas.  (Tr. 19-20.)  Almela testified that the

pans were browned, a condition that develops only after several years of use.  (Tr. 20.)
That fact led Almela to conclude that the pans were not new.

Two other connections between the two restaurants emerged from the evidence.
First, according to an e-mail that Kamini sent to Almela, she injured her hand and went to
the hospital for treatment while learning to make dough at the Jackson Heights
Restaurant on December 14, 2010.   (Almela Aff., Jan. 12, 2011, Ex. A.)  Second, Kamini
admitted that the Jackson Heights Restaurant displayed both its own menu and the menu
from the Avenue C Restaurant. (K. Vadhan Dep. 62-63.)  Both menus were introduced
into evidence (Pl.'s Exs. 3-4) and appear virtually identical.  With a handful of
exceptions, the menus offer pizzas and other menu items with identical names and
ingredients.  The menus use the same design scheme and very similar pictures and
contain the same colors, font, coupons, and credit card information.  The menus also list
identical calorie information even though Queens New York Famous Pizza, as a single
operation, is not required by law to supply calorie information on its menus.  *See* 25
N.Y.C.R.R. § 81.50.  The menu for the Jackson Heights Restaurant uses a logo for
Queens New York Famous Pizza that Singas alleges infringes on its trademark for the
Singas logo.

Kamini testified that the calorie information on the menu for the Avenue C
Restaurant came from Singas but denied providing the calorie information to her
husband.   (K. Vadhan Dep. 48, 60-61.)  Arun testified that he took photographs of pizza
for the menus and then gave those photographs to a printer to print the menus, but he
could not recall whether he gave the printer the Singas menu, where the printer found the

calorie information for the Jackson Heights Restaurant menu, or even whether he asked the printer to include calorie information.  (Tr. 77-78; A. Vadhan Dep. 24-27.)

After José put Almela in touch with the Vadhans on November 18, Almela scheduled a meeting for the next day.  (Tr. 17.)  The three met as scheduled in the Vadhans' car outside the Jackson Heights Restaurant.  (Tr. 17.)  Almela testified that Arun told him that he had obtained the lease on the Jackson Heights Restaurant before Tsanis declined to approve it as a Singas Franchise.  (Tr. 17.)  According to Almela, Arun said it was the Vadhans' intention to train personnel at the Jackson Heights Restaurant who could be employed at the Avenue C Restaurant, which Almela had found to be replete with problems in a recent report, and to turn the Jackson Heights Restaurant into a Singas after Tsanis saw it could be successful.  (Tr. 18.)  Arun also testified that he told Almela that operating the Jackson Heights Rertaurant could help Kamini at the Avenue C Restaurant and that "we can train the people here and then send them over there."  (A. Vadhan Dep. 32-33.)  Almela asked Kamini for her opinion and she said that she thought the Vadhans would do well.  (Tr. 18.)  Kamini also testified at her deposition that having her husband operate the Jackson Heights Restaurant could assist her in obtaining documentation for workers at the Avenue C Restaurant.  (K. Vadhan Dep. 59-60.)

Singas terminated the Agreement on November 28, 2010 and filed this action [1] for breach of contract and trademark infringement on November 30, 2010.  On December 15, 2010, Singas moved [5] for a preliminary injunction.  A hearing on the motion was held on January 14, 2011 at which Almela, Vadhan, and Arun testified.

The Vadhans testified that, after the filing of the motion, Arun changed the corporate name of Singas Express to Queens New York Famous Pizza at Kamini's

8

request.  (Tr. 60, 72-73.)  An exhibit to an affidavit by Kamini corroborates that

testimony, (K. Vadhan Aff. Ex. 1), though the testimony also suggested that the change

might not have become final and that Singas Express might still own the Jackson Heights

Restaurant.  (Tr. 80.)  The testimony also showed that Kamini has continued to operate

the Avenue C Restaurant as a Singas franchise.  That restaurant has a Singas sign, uses

Singas menus and bags, and employs personnel wearing shirts with Singas logos.  (Tr.

20, 66; Almela Aff., Nov. 29, 2010, Ex. J.)

Singas also introduced evidence of posts on internet message boards related to

Jackson Heights in which a commentator reported that "the guy from [the Jackson

Heights Restaurant] told me it's the same food as [Singas], but they had licensing issues,

so they had to change the name."  (Pl.'s Ex. 8.)  The commentator also reported that he or

she could "tell [that the Jackson Heights Restaurant is] a chain, though [because] they

have the calorie information – which is required by all places with something like 5

locations or more." (*Id.*)

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 empowers a district court to issue a

preliminary injunction on notice to the adverse party.  *See* Fed. R. Civ. P. 65(a).  "In

order to justify a preliminary injunction, a movant must demonstrate 1) irreparable harm

absent injunctive relief; 2) either a likelihood of success on the merits, or a serious

question going to the merits to make them a fair ground for trial, with a balance of

hardships tipping decidedly in the plaintiff's favor, and 3) that the public's interest

weighs in favor of granting an injunction."  *Metro. Taxicab Bd. of Trade v. City of New

York*, 615 F.3d 152, 156 (2d Cir. 2010) (quotation marks and internal citation omitted).

## DISCUSSION

Singas alleges two claims: trademark infringement under the Lanham Act and breach of contract under New York law.  On the basis of the alleged breach of contract, Singas seeks a preliminary injunction restraining defendants from in *any way* operating the Avenue C Restaurant and the Jackson Heights Restaurant.  If that injunction should issue, an injunction restraining defendants from using Singas's marks at those restaurants would be superfluous.  Accordingly, the Court begins by considering the breach of contract claim and Singas's request for a preliminary injunction totally restraining the operation of the Avenue C Restaurant and the Jackson Heights Restaurant.

### A. **Irreparable Harm**

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'"  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono,* 175 F.3d 227, 234 (2d Cir. 1999)).  "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotation marks omitted).  Hence "a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation."  *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quotation marks omitted).

The Second Circuit has rejected the proposition "that irreparable harm must inevitably be assumed in breach of covenant cases." *Baker's Aid v. Hussman Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987). "Though courts often issue preliminary injunctions when it appears likely that the plaintiff will prevail in covenant-not-to-compete cases, this is not an automatic process, but instead depends upon the factual particulars in each case." *Id.* In general, "a loss of prospective goodwill can constitute irreparable harm," *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995), though "not where the loss of goodwill was doubtful and lost profits could be compensated with money damages." *John E. Andrus Mem'l, Inc. v. Daines*, 600 F. Supp. 2d 563, 571 (S.D.N.Y. 2009); *see also Penthouse Int'l, Ltd. v. Playboy Enter., Inc.*, 392 F. Supp. 257, 261 (S.D.N.Y. 1974) ("Though injury to reputation or goodwill is often viewed as irreparable, such injury is not always irreparable"). "Generally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004). On the other hand, "conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *Shepard Indus., Inc. v. 135 East 57th Street, LLC*, No. 97-CV-8447, 1999 WL 728641, at *8 (S.D.N.Y. Sept. 17, 1999).

"Although the definition of goodwill has taken different forms over the years, the shorthand description of good-will as the expectancy of continued patronage provides a useful label with which to identify the total of all the imponderable qualities that attract customers to [a] business." *Newark Morning Ledger Co. v. United States,* 507 U.S. 546,

555-56 (1993) (internal citation and quotation marks omitted); *see also Gen. Cigar Co., Inc. v. G.D.M. Inc.,* 988 F. Supp. 647, 659 (S.D.N.Y. 1997). ("Good will has been defined as the value attributable to a going concern apart from its physical assets—the intangible worth of buyer momentum emanating from the reputation and integrity earned by the company.")  (quotation marks omitted).

    As an initial matter, it is worth noting that, in Paragraph 22.05 of the Agreement, Ganesha Oak, per Kamini, "acknowledge[d] that the restrictions set forth in this Section 22 are reasonable and necessary for the protection of the proprietary interest of the Franchisor [and] the violation of them would cause substantial and irreparable injury to Franchisor . . . ."  (Agreement ¶ 22.05).  Such a provision "might arguably be viewed as an admission by [defendants] that plaintiff will suffer irreparable harm were [defendants] to breach the contract's non-compete provision."  *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999).  On the other hand, "contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate."  *Baker's Aid*, 830 F.2d at 16.  Such language is instead "merely one factor that must be considered in deciding whether irreparable harm would result if an injunction did not issue."  *Markovits v. Venture Info Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001).

    Another factor is that "[t]here is a recognized danger that former franchisees will use the knowledge that they have gained from the franchisor to serve its former customers, and that continued operation under a different name may confuse customers and thereby damage the good will of the franchisor."  *ServiceMaster Residential/Commercial Serv., L.P. v. Westchester Cleaning Serv., Inc.*, 01-CV-2229,

2001 WL 396520, at *3 (S.D.N.Y. Apr. 19, 2001).  Thus, in cases involving competing

businesses offered by a former franchisee, the "potential harm . . . arises from

Defendant's ability to trade on the knowledge and customer relationships gained as a . . .

franchise, which impacts on Plaintiff's good will and its interest in re-franchising the

market."  *Id.*  at *4.  Numerous courts have cited those reasons in finding that franchisors

would suffer irreparable harm from a competing business operated by a former

franchisee.  *See, e.g., Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,

511 F.3d 535, 550 (6th Cir. 2007) ("The likely interference with customer relationships

resulting from the breach of a non-compete agreement is the kind of injury for which

monetary damages are difficult to calculate" and "precisely what Plaintiff will suffer if

Defendants are allowed to continue to breach the franchise agreement's non-compete

clause."); *H & R Block Tax Serv. LLC v. Kutzman*, 681 F. Supp. 2d 1248, 1252 (D. Mont.

2010) ("The damage to H & R Block will be to their franchise operation, to their

patronage, and to their client relations.  Under such circumstances, it is difficult to

calculate Plaintiffs' full damages."); *NaturaLawn of Am., Inc. v. West Group, LLC*, 484

F. Supp. 2d 392, 402 (D. Md. 2007) ("It is perfectly obvious that if the defendants are not

enjoined, plaintiff will be permanently damaged and permanently shut out of the market

in the counties at issue because few if any prospective franchisees will agree to step into

the relevant market."); *RESCUECOM Corp. v. Mathews*, No. 5:05-CV-1330, 2006 WL

1742073, at *2 (N.D.N.Y. June 20, 2006); *Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.*, 834

F. Supp. 683, 692 (D. N.J. 1993) ("Were we not to grant a preliminary injunction, the

good will of the franchisor would be harmed by the existence of a competing service

center at the very site of the former Jiffy Lube center.  Since customers are likely to

patronize businesses close to home or work, the operation of a second service center, even without the Jiffy Lube logo, would greatly impair plaintiff's ability to establish another franchise in the area.").

      With respect to the Avenue C Restaurant, there is no reason why this case is any different.  Indeed, the danger of lost goodwill "can be particularly true where the business operates out of the same location."  *ServiceMaster Residential/Commercial Serv., L.P.*, 2001 WL 396520, at *3.  The Avenue C Restaurant is essentially a renegade Singas franchise.  If that restaurant serves food that is different from the kind of food that Singas customers expect, Singas stands to lose goodwill among those customers.  Indeed, the evidence at the hearing showed that Singas decided to approve the Avenue C location because a former franchise on Second Avenue had enjoyed success.  Dissatisfied or surprised customers could report that Singas had changed or fallen off when they have not eaten at a Singas at all.  The reputational damage from any such rumor could not be easily quantified.  Moreover, the existence of a renegade Singas franchise in Lower Manhattan would inhibit Singas's ability to convince a new franchisee to open shop in that area.  In that case, "[t]he speculative availability of an ephemeral damages remedy for defendants' violations is little more than a hope (and a thin one, indeed) on this record."  *NaturaLawn of Am., Inc.*, 484 F. Supp. 2d at 402.

      The Jackson Heights Restaurant, however, presents a closer question.  With respect to that restaurant, the argument that Singas would have difficulty persuading another franchisee from opening in the vicinity of the Jackson Heights Restaurant seems less convincing.  After all, the entire premise of this case is that Singas did not want a

franchise in Jackson Heights because it would compete with Singas's flagship location one mile away.

Singas also argues that "if Singas is prevented from enforcing the Post-Term Covenants which covenants are similar to those executed by other franchisees, 'other franchisees would get the message that they could defraud with impunity.'" (Pl.'s Br. 23 (quoting *Jiffy Lube Int'l, Inc.*, 834 F. Supp. at 692-93).) Some courts have reasoned that "the franchise system itself is endangered if a franchise is permitted to avoid its reasonable non-compete obligations." *ServiceMaster Residential/Commercial Serv., L.P.*, 2001 WL 396520, at *4; *see also Smallbizpros, Inc. v. Court*, 414 F. Supp. 2d 1245, 1251 (M.D. Ga. 2006) (noting that "the covenant not to compete exists to preserve Plaintiff's ability to . . . maintain the integrity of the franchise 'system'" and that this purpose "will be impaired if the covenant not to compete is not enforced"). But another court in this Circuit has found that reasoning unpersuasive. *See Pirtek USA, LLC v. Zaetz*, 408 F. Supp. 2d 81, 86 (D. Conn 2005). That court agreed it was "no doubt correct that the value of [a] Franchise Agreement will be severely diminished and [a] business model threatened unless [the franchisor] can enforce the covenant . . . ." *Id.* However, the *Pirtek* court reasoned that "a denial of the preliminary injunction does not mean that [the franchisor] will be unable to enforce the covenant." *Id.* Rather, "[it] simply means that [the franchisor] must seek to enforce it at a later stage of the legal proceedings." *Id.* Thus the court found that "denial of th[e] preliminary injunction will not encourage other franchisees that they can abandon their franchise agreements as they may be held liable for doing so." *Id.* Singas advances no reason why the same is not true here.

Still, the evidence showed that the Jackson Heights Restaurant seems to be trying to trade on a relationship with Singas when it has none.  It hardly seems unlikely that consumers would associate the Jackson Heights Restaurant with Singas where the restaurant is in the same delivery area as Singas's flagship store, advertises together with Singas, uses a menu that is nearly exactly the same as the Singas menu, displays both menus together, and slices its pizza using a machete, a practice that is used only by Singas.   Indeed, evidence of posts from internet message boards related to Jackson Heights show that the public appears somewhat confused as to whether the Jackson Heights Restaurant is a Singas franchise.  Although one commentator concluded that the Jackson Heights Restaurant "appeared to be independent," the fact that the commentator found it necessary to say so suggests that others were confused.  Another commentator wrote that "the guy from [the Jackson Heights Restaurant] told me it's the same food as [Singas], but they had licensing issues, so they had to change the name."  That commenter, however, could "tell [that the Jackson Heights Restaurant is] a chain, though [because] they have the calorie information – which is required by all places with something like 5 locations or more."

In fact, the rule applies to any "restaurant that is one of a group of 15 or more food service establishments doing business nationally," under common ownership, as part of a franchise, or doing business under the same name.  25 N.Y.C.R.R. § 81.50.  But the point is that the Jackson Heights Restaurant appears to be cultivating the misimpression that it is part of a chain in circumstances where customers will incorrectly identify that chain as Singas.  That makes the Jackson Heights Restaurant little different from the Avenue C Restaurant.  Perhaps only the Avenue C Restaurant is truly a renegade Singas,

but with respect to both restaurants, Singas stands to lose goodwill among customers who expect that any restaurant that appears to be affiliated with Singas really is a Singas.

Where a similar misimpression results from trademark infringement by a former licensee, courts have found consumer confusion to be at least strong evidence of irreparable harm because "after a license has been revoked, there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder."  *Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004).  *Cf. Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 42 (2d Cir. 1986) ("[I]n a licensor/licensee case the reasons for issuing a preliminary injunction for trademark infringement are more compelling than in the ordinary case.").  True, only the Singas logo is a protected mark, and the Court has not expressed any opinion as to whether the Jackson Heights Restaurant menu infringes on that mark.  But evidence of likely consumer confusion is at least strong evidence of irreparable harm in infringement cases because it shows a likelihood of damage to goodwill associated with the marks.  *Cf. id.* at 43 ("The unauthorized use of a mark by a former licensee invariably threatens injury to the economic value of the goodwill and reputation associated with a licensor's mark.  *As a consequence*, a licensor who establishes a likelihood of confusion as to product source in a trademark infringement suit simultaneously demonstrates the requisite irreparable harm essential to obtaining a preliminary injunction.") (emphasis added).  Where the Jackson Heights Restaurant seems likely to create—and to have already created—confusion among customers within the delivery area of its original flagship store with whom Singas has built goodwill, an

injunction is warranted to prevent harm to that goodwill regardless of whether the Jackson Heights Restaurant has infringed Singas's trademark in its logo.

### B.  Likelihood of Success on the Merits

Under New York law, in order to succeed on its breach of contract claim, Singas will have to show:  "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004); *see also JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 893 N.Y.S.2d 237, 238 (2d Dep't 2010).  Singas alleges that defendants breached the In-Term Covenant by operating the Jackson Heights Restaurant; that this breach entitled Singas to terminate the Agreement; that Singas terminated the Agreement in accordance with the Agreement; and that, following termination, defendants have continued to breach the Post-Term Covenant and the Non-Competition Agreement by operating the Avenue C and Jackson Heights Restaurants.[1]

The parties do not contest that Singas, per Tsanis, and Ganesha Oak, per Kamini, entered into the Agreement.  In Paragraph 22.02 of the Agreement, Ganesha Oak agreed as follows:

> [Ganesha Oak], and . . . any officers, directors and five percent (5%) or greater shareholders of a corporation which owns the franchisee shall not, during the period of Franchisee's Affiliation with Franchisor . . . engage, either directly or indirectly, in the ownership or operation, as a shareholder, through agents,

---

[1] Singas also alleges that defendants breached a provision of the Agreement prohibiting assignment of the franchise without consent because Singas never consented to—or was even asked about—an assignment to 11 Classic.  (*See* Compl. ¶19; Defs.' Reply Br. 4.) The Court need not express any opinion regarding that allegation on the present record. It suffices to note that it appears from the evidence that Kamini never obtained the name to Ganesha Oak.

affiliated or otherwise in any business which is the same or substantially similar to Singas . . . including, without limitation, any Italian food business.

(Agreement ¶ 22.02.)  As President of Ganesha Oak, Kamini was bound by this In-Term Covenant and also agreed to personally guarantee it.[2]

The central issue at the preliminary injunction hearing was whether Kamini breached the In-Term Covenant by directly or indirectly owning or operating the Jackson Heights Restaurant.  On that point, *Pirtek* is again instructive.  That case involved a motion by Pirtek, a franchisor of industrial and hydraulic hose installation businesses, to enjoin Hose Medic, an installation business operated by Peter Zaetz.  Home Medic was operating within a geographic area specified by a non-competition covenant signed by Irwin Zaetz, Peter's father and a former Pirtek franchisee under the name HHS.  Where evidence at the preliminary injunction hearing showed that (1) "Hose Medic [wa]s located at the same address as HHS and Irwin Zaetz'[s] home"; (2) the "services provided by Hose Medic [we]re the same those provided by HHS when it was in business"; (3) "Peter Zaetz represented to HHS' clients that he was continuing the same operation under a different name"; and (4) "Peter Zaetz/Home Medic made substantial monthly payments to Irwin Zaetz," the court found that "Pirtek ha[d] produced compelling indirect evidence that Irwin Zaetz . . . breached the covenant not to compete by assisting his son in establishing Hose Medic."  408 F. Supp. 2d at 87. [3]

_____

[2] It seems worth asking how Kamini could be sole owner and President of a corporation which she does not seem to have formed.  But that is hardly a reason to absolve her of the obligations she personally guaranteed.   In any event, even if 11 Classic was the *de facto* franchisee, Kamini freely admits she was the sole owner and President of that entity.

[3] *Pirtek* is instructive even though the court in that case denied the motion for preliminary injunction on the ground that the plaintiff failed to show irreparable harm.  In that case, "the court heard undisputed evidence at the hearing as to exactly how much any illegally

It is just so here.  Evidence introduced at the hearing showed a series of connections between the Jackson Heights Restaurant and the Avenue C Restaurant.  Arun took out advertisements listing both restaurants on the same page and hired a former Avenue C employee, José, to make the pizza at the Jackson Heights Restaurant.  When asked to contact the owner of the Jackson Heights Restaurant, José called Kamini, not Arun.   Both Kamini and Arun also met with Almela in response to his inquiries regarding the Jackson Heights Restaurant and they told him that they could use income, training, and other resources from the Jackson Heights location to assist Kamini with the Avenue C Restaurant.  And Kamini trained to make dough at the Jackson Heights Restaurant.

The sharing also appeared to run in both directions.  The Jackson Heights Restaurant appeared to be using pizza pans from the Avenue C Restaurant.  Kamini also admitted that she placed the Avenue C Restaurant menu at the Jackson Heights Restaurant next to the menu for that restaurant.  And, most significantly, those two menus are nearly identical in almost every respect.  Though it is not required to do so, the Jackson Heights Restaurant lists calorie information on its menu that is identical to the information listed on the Avenue C Restaurant menu.  That suggests that the Jackson Heights Restaurant merely copied the Avenue C Restaurant menu, particularly where Arun could not explain how the printer obtained the calorie information and could not recall whether he provided the Singas menu to the printer.  Finally, Arun changed the name of the corporate owner of the Jackson Heights Restaurant at Kamini's request.  In light of all this indirect evidence, it strains reason to conclude that Kamini was not

acquired goodwill was worth."  408 F. Supp. 2d at 86.  There has been no such showing here.

"assisting [her husband] in establishing" the Jackson Heights Restaurant. At the least, it is likely that Singas will be able to prove as much.

Since Singas could likely show that Kamini was at least indirectly operating the Jackson Heights Restaurant in breach of the In-Term Covenant, Singas could likely show that it had grounds to terminate the Agreement.[4] That termination triggered other provisions of the Agreement whose breach gives rise to Singas's breach of contract claim. In Paragraph 22.03 of the Agreement, Ganesha Oak agreed that, upon termination, "the Franchisee shall immediately cease all pizza service related business activities." That provision further provides as follows:

> Franchisee . . . . and any officers, directors and five percent (5%) or greater shareholders of a corporation which owns the franchise, agrees for a period of two (2) years from the date of termination or nonrenewal of this Agreement, not to either directly or indirectly continue engaging in the Italian food service business, nor acquire any interest in any competitive Italian food service business or venture or any substantially similar business to that of a Singas franchise within ten (10) miles of the Singas where Franchisee had the Affiliation."

(Agreement ¶ 22.03.) Ganesha Oak, per Kamini, also agreed to a nearly identical provision in the Non-Competition Agreement. (Non-Competition Agreement ¶ 3.) Ganesha Oak also agreed that the provision of the Non-Competition Agreement was "fair

---

[4] In her affidavit, Kamini states that "Singas has wrongfully allowed several Singas Franchise[] Stores to open stores within ten (10) miles of my store." (Karmini Aff. in Opp. to Mot. to Dismiss ¶ 9(e).) Perhaps so, but that is not a breach of the Agreement because Singas never agreed not to open any other store more than 10 blocks from the location of the Ganesha Oak franchise. (Almela Aff., Jan. 11, 2011, Ex. B.) Kamini also argues that Singas has breached the agreement by failing to resolve this matter through arbitration pursuant to Paragraph 23.01 of the Agreement. (*See id.* ¶ 9(d).) That argument, too, is meritless because Paragraph 23.06 of the Agreement provides that, "[n]otwithstanding the foregoing provisions of arbitration, the Franchisor shall have the right to obtain injunctive relief to terminate or prevent the continuation of any default or violation . . . . under customary equity rules." Finally, Vardhan charges that Singas failed to provide her with various resources she alleges Singas was obligated to provide. (*See id.* ¶ 9(a)-(c).) Those allegations are wholly conclusory and without merit.

and reasonable as to both the time and distance restrictions."  As the President and sole

owner of Ganesha Oak and a personal guarantor of the Agreement, Kamini was bound by

the Post-Term Covenant and Non-Competition Agreement.

   "The issue of whether a restrictive covenant not to compete is enforceable by way

of an injunction depends in the first place upon whether the covenant is reasonable in

time and geographic area."  *Ticor Title Ins. Co.*, 173 F.3d at 69; *see also Elite*

*Promotional Marketing, Inc. v. Stumacher*, 779 N.Y.S.2d 528, 530 (2d Dep't 2004) ("A

restrictive covenant against competition must also be reasonably limited temporally and

geographically.").  Applying that principle, "[c]ourts have recognized the validity of

restrictive covenants in . . . franchisee contracts" where the covenants are "reasonably

related to [a franchisor's] interest in protecting its know-how and to its ability to install

another franchise in the same territory."  *Carvel Corp. v. Eisenberg*, 692 F. Supp. 182,

186 (S.D.N.Y. 1988) (upholding covenant in franchise agreement "limiting the

defendants' ability to operate an ice cream store within two miles of their present location

for three years").  The Post-Term Covenant and Non-Competition Agreements prohibited

a terminated franchisee from directly or indirectly owning or operating "an Italian food

service business" within 10 miles of the terminated franchise for two years.  Given

evidence that it took four years to find a suitable location for a franchise in Lower

Manhattan after the closure of the former Second Avenue franchise, the time and distance

restrictions appear reasonably tailored to permit Singas to open another franchise in the

area of the Avenue C Restaurant.  *Compare DAR & Assocs., Inc. v. Uniforce Serv., Inc.*,

37 F. Supp. 2d 192, 199 (E.D.N.Y. 1999) (upholding provision restricting former licensee

from competing within fifty miles of former place of business for one year) *and TKO*

*Fleet Enter., Inc. v. Elite Limousine Plus, Inc.*, 708 N.Y.S.2d 593, 596 (Sup. Ct. N.Y. County 2000) (upholding provision restricting former limousine franchisee from competing within fifty miles of Times Square for one year), *with Maxon v. Franklin Traffic Service, Inc.*, 689 N.Y.S.2d 559, 561 (4th Dep't 1999) (holding that provision restricting former franchisee from competing within 300 miles for five years could not be enforced).  Accordingly, Singas will likely be able to enforce the Post-Term Covenant and Non-Competition Agreements.

The evidence adduced at this stage also shows that Singas will likely be able to show that Kamini violated the Post-Term Covenant and Non-Competition Agreement. These agreements obligated Kamini "not to either directly or indirectly continue engaging in the Italian food service business" within 10 miles of the Avenue C Restaurant.  There is no dispute that Kamini continues to operate an "Italian food service business" at the Avenue C Restaurant.  That is a breach of the Post-Term Covenant and the Non-Competition Agreement.  It is undisputed that the Jackson Heights Restaurant is within 10 miles of the Avenue C Restaurant and the Court has already found that Singas will likely be able to show that Kamini was at least indirectly involved in the Jackson Heights Restaurant.  Thus Singas will likely be able to show that the operation of the Jackson Heights Restaurant is a breach of the Post-Term Covenant and the Non-Competition Agreement.

### C.  Balance of Hardships and Public Interest

It is also important to consider the harm to the party to be enjoined.  The Court does not shrug at what enjoining the two restaurants would mean to defendants, who claim to have invested significant amounts of time and money in both the Avenue C and

23

Jackson Heights Restaurants in the hope of earning income from Singas franchises.  But equity does not require Singas to suffer because defendants did not secure permission before paying for the property in Jackson Heights.  Any hardship defendants would suffer from an injunction would stem from their own breaches of the Agreement and the Non-Competition Agreement.  Defendants were hardly unaware of that Agreement or its implications:  they knew enough to ask Singas for permission to open the Jackson Heights Restaurant as a franchise and were savvy enough to try and change the name of the company that owned the Jackson Heights Restaurant to "Queens NY Famous Pizza" from Singas Express once Singas warned Kamini of the breach.  In these circumstances, the balance of hardships and the public interest weighs in favor of an injunction.

### D.  Bond

Defendants argue that Singas "should be required to post a bond for Defendants' damages if a pretrial injunction should be granted."  (Defs.' Br. 8.)  Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  However, the Agreement provides that "the Franchisee agrees that the Franchisor may have such injunction relief without necessity of posting a bond. . . ."  (Agreement ¶ 23.06.)   Accordingly, no bond is required.  *See Marsh USA Inc. v. Karasaki*, No. 08-CV-4195, 2008 WL 4778239, at *21 (S.D.N.Y. Oct. 31, 2008) ("Moreover, the parties agreed in Section 7 of the RCA that no bond would be required for any temporary or permanent injunction, and the parties may agree to waive the bond requirement.").  *Cf. Clarkson Co., Ltd. v. Shaheen,* 544 F.2d 624, 632 (2d Cir.

1976) ("[B]ecause, under Fed. R. Civ. P. 65[c], the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond.") (internal citation omitted).

## CONCLUSION

For the foregoing reasons, Singas's motion [5] for a preliminary injunction is GRANTED.   Defendants are enjoined from operating in any way, directly or indirectly, (a) the restaurant located at 94 Avenue C, New York, New York and doing business as Singas Famous Pizza; and (b) the restaurant located at 35-68 73rd Street, Queens, New York and doing business as Queens New York Famous Pizza.[5]

SO ORDERED.

Dated: New York, New York
      February 10, 2011

                                      Richard J. Holwell
                             United States District Judge

---

[5] As discussed above, it is unclear from the record whether defendant Singas Express is now known as Queens New York Famous Pizza.  To the extent that defendant Singas Express has changed its corporate name, the injunction shall apply to any successor as well.